IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
November 8, 2000 Session

# BELLSOUTH BSE, INC. v. TENNESSEE REGULATORY AUTHORITY

**Tennessee Regulatory Authority**
**No. 98-00879**

---

### No. M2000-00868-COA-R12-CV - Filed February 18, 2003

---

BellSouth BSE, Inc. appeals from an order of the Tennessee Regulatory Authority denying BSE's application for certification as a competing local exchange company in those areas where BSE's affiliate, BellSouth Telecommunications, is the incumbent provider of local services. Because the TRA denied the petition on the basis that such certification may be inconsistent with the goal of fostering competition and could be potentially adverse to competition, as opposed to establishing conditions or requirements designed to ensure that anticompetitive practices did not occur, we vacate the order as beyond the agency's statutory authority.

### Tenn. R. App. P. 12 Appeal as of Right; Judgment of the Tennessee Regulatory Authority Vacated and Remanded

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J., M.S., and WILLIAM C. KOCH, JR., joined.

Guilford F. Thornton, Jr., Nashville, Tennessee, for the appellant, Bellsouth BSE, Inc.

Henry Walker, Nashville, Tennessee, for the appellees, MCI WorldCom, Southeastern Competitive Carriers Association, Time Warner Communications of the South, L.P. and US LEC of Tennessee, Inc.

J. Richard Collier, Jonathan N. Wike, Nashville, Tennessee, for the appellee, Tennessee Regulatory Authority.

### OPINION

Before the state legislature made significant changes in the law governing telecommunications services in 1995, local telephone service was provided to consumers in a locality by one company under a regulated monopoly system. The adoption of the Tennessee Telecommunication Act, 1995 Tenn. Pub. Acts 408 (effective June 6, 1995), abolished monopolistic

control of local telephone service and opened that market to competition. It also changed the way in which providers of such services, and the rates they charge, were regulated.

As part of the implementation of local service competition, a company which was providing basic local exchange telephone service, as defined by statute, prior to June 6, 1995, was designated as the "incumbent local exchange telephone company," or ILEC. Tenn. Code Ann. § 65-4-101(d). New entrants into the market after June 6, 1995, were known as "competing telecommunications service providers" or CLECs. Tenn. Code Ann. § 65-4-101(e). To become a CLEC, a provider is required to be certificated pursuant to Tenn. Code Ann. § 65-4-201, which provides in pertinent part:

> After notice to the incumbent local exchange telephone company and other interested parties and following a hearing, the authority shall grant a certificate of convenience and necessity to a competing telecommunications service provider if after examining the evidence presented, the authority finds:
>
> (1) The applicant has demonstrated that it will adhere to all applicable authority policies, rules and orders; and
>
> (2) The applicant possesses sufficient managerial, financial and technical abilities to provide the applied for services.

Tenn. Code Ann. § 65-4-201(c).

BellSouth BSE, Inc. applied for a certificate as a CLEC (First Application) to provide local telephone services on a statewide basis. BellSouth BSE, Inc. is a wholly owned subsidiary of BellSouth BSE Corporation which, in turn, is a wholly owned subsidiary of BellSouth Corporation. BellSouth Telecommunications ("BST"), another wholly-owned subsidiary of BellSouth Corporation, is the incumbent local exchange provider for portions of Tennessee. The Tennessee Regulatory Authority ("TRA") granted BellSouth BSE, Inc. ("BSE") authority to provide local services only in those territories where its affiliate, BST, was not the ILEC. The TRA concluded that the potential for anticompetitive harm outweighed the benefits to consumers if BSE were permitted to operate as a CLEC in those areas where its affiliate was providing local service as the ILEC.

BSE, however, was invited to re-open the issue if at any time in the future it believed it could "carry the public interest burden herein raised and alleviate the Agency's concerns with regard to Tenn. Code Ann. § 65-5-208(c). . . ." BellSouth BSE, Inc. did just that and sought expanded authority to operate as a CLEC (Second Application). Competitors were allowed to intervene,[1] and a hearing was held. The TRA denied the petition. It is that denial which is the subject of this appeal.

---

[1]The intervenors who are also appellees in this appeal are MCI WorldCom, Inc., Southeastern Competitive Carriers Association, Time Warner Telecom of the Mid-South, L.P., and US LEC of Tennessee, Inc.

BSE did not propose to offer any services that could not be offered by BST. BSE intended to provide "any and all services that are or may be provided by a local exchange carrier."

## I.  The TRA's Concerns

In denying BSE's application for a certificate of convenience and necessity to provide expanded intrastate telecommunications services, the TRA recounted that the Second Application proceedings were held to provide BSE the opportunity to alleviate the concerns which led to the TRA's order on the First Application. Those concerns are related to the potential for anticompetitive behavior and the potential for BST to avoid controls imposed upon it because of its status as an ILEC, as well as its status under federal law as a "Bell operating company," through the use of an affiliate. The TRA expressed several specific areas of concern, which can only be examined in the context of the regulatory framework, both state and federal, for telecommunication services providers.

By enactment of the Telecommunications Act of 1996, Congress made fundamental changes in local telephone markets by, among other things, prohibiting states from enforcing laws that impede competition.  In order to facilitate the transition from regulated monopolies to true competition, the Act imposes upon the incumbent provider or ILEC, who formerly enjoyed the monopoly, a number of duties intended to facilitate entry into the market by other, formerly excluded, providers. *AT & T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 371-72, 119 S. Ct. 721, 726-27 (1999).  As more specifically explained:

> Until the passage of the 1996 Act, state utility commissions continued to regulate local telephone service as a natural monopoly.  Commissions typically granted a single company, called a local exchange carrier (LEC), an exclusive franchise to provide telephone service in a designated area.  Under this protection the LEC built a local network – made up of elements such as loops (wires), switches, and transmission facilities – that connects telephones in the local calling area to each other and to long distance carriers.
>
> The 1996 Act brought sweeping changes.  It ended the monopolies that incumbent LECs held over local telephone service by preempting state laws that had protected the LECs from competition. *See* 47 U.S.C. § 253.  Congress recognized, however, that removing the legal barriers to entry would not be enough, given current technology, to make local telephone markets competitive.  In other words, it is economically impractical to duplicate the incumbent LEC's local network infrastructure.  To get around this problem, the Act allows potential competitors, called competing local exchange carriers (CLECs), to enter the local telephone market by using the incumbent LEC's network or services in three ways.  First, a CLEC may build its own network and "interconnect" with the network of an incumbent. *See id.* § 251(c)(2).  Second, a CLEC may lease elements (loops, switches, etc.) of an incumbent LEC's network "on an unbundled basis." *See id.* §

251(c)(3). Third, a CLEC may buy an incumbent LEC's retail services "at wholesale rates" and then resell those services to customers under its (the CLEC's) brand. *See id*. § 251(c)(4).

*GTE South, Inc. v. Morrison*, 199 F.3d 733, 737 (4th Cir. 1999).

This access is accomplished through an interconnection agreement between the ILEC and a CLEC. In addition, an ILEC is required to provide access to its network elements and various services and to provide dialing parity to competing providers on a nondiscriminatory basis. 47 U.S.C. §§ 251(c)(3) & 251(b)(3). The FCC has promulgated rules and policies implementing those provisions "to require incumbent LECs to provide competition with access to the incumbent LECs' networks sufficient to create a competitively neutral playing field for new entrants. . . ." *In Re Implementation of the Telecommunications Act of 1996, Third Report and Order* in CC Docket No. 96-115, *Second Order on Reconsideration of the Second Report and Order* in CC Docket No. 96-98, and *Notice of Proposed Rulemaking* in CC Docket No. 99-273, at ¶ 6 (rel. Sept. 9, 1999).

Under state law, all providers are required to provide non-discriminatory interconnection to their public networks under reasonable terms and conditions, and all are to be provided "desired features, functions and services promptly, and on an unbundled and non-discriminatory basis from all other telecommunications providers." Tenn. Code Ann. § 65-4-124(a).

At the state level, incumbent providers are also governed by specific provisions, again designed to facilitate entry into the local telephone service market by competitors. For example, rates to be charged by incumbent providers opting to be under a price regulation plan are subject to a requirement that such rates be just and reasonable, defined as "affordable", as determined by the TRA. Tenn Code Ann. § 65-5-209(a). These rates are subject to limitations, including safeguards to ensure universal service and nondiscrimination among customers. Tenn. Code Ann. § 65-5-209(b).

After the initial qualification of a price regulation plan, an ILEC's ability to increase rates is subject to limitations. Essentially, a price regulated ILEC can adjust rates for specific services subject to an overall maximum annual adjustment to aggregate revenues for such services. Tenn. Code Ann. § 65-5-209(e). However, rates for basic services cannot be increased for four (4) years after implementation of the plan, and annual increases for basic services are thereafter limited to annual rates of inflation. Tenn. Code Ann. § 65-5-209(f).

ILECs not under a price regulation plan are subject to traditional rate regulation. ILECs have unique, carrier-of-last-resort obligations and universal service obligations. Tenn. Code Ann. § 65-5-207(c)(2) & (8). ILECs, upon request, are required to provide interconnection services to CLECs. Tenn. Code Ann. § 65-5-209(d). None of these burdens apply to CLECs.

Another requirement for ILECs which was the subject of argument herein and part of the TRA's reasoning is that found in Tenn. Code Ann. § 65-5-208(c), which provides:

Effective January 1, 1996, an incumbent local exchange telephone company shall adhere to a price floor for its competitive services subject to such determination as the authority shall make pursuant to § 65-5-207.[2] The price floor shall equal the incumbent local exchange telephone company's tariffed rates for essential elements utilized by competing telecommunications service providers plus the total long-run incremental cost of the competitive elements of the service. When shown to be in the public interest, the authority shall exempt a service or group of services provided by an incumbent local exchange telephone company from the requirement of the price floor. **The authority shall, as appropriate, also adopt other rules or issue orders to prohibit cross-subsidization, preferences to competitive services or affiliated entities, predatory pricing, price squeezing, price discrimination, tying arrangements or other anti-competitive practices.**

(emphasis added).

It is the highlighted language which provides the primary basis for the TRA's denial of BSE's application for CLEC status in those areas where its affiliate is the incumbent provider. The TRA expressed concerns that the relationship between BSE and BST fostered the potential for the enumerated, or other, anticompetitive activities, as well as the opportunity for BST to avoid the limitations placed on it as an ILEC. The six concerns, or issues for resolution, expressed by the TRA were:

1. Whether there exists the potential for discriminatory treatment of other CLECs or for preferential treatment of BSE by BellSouth when there are no safeguards being offered to monitor affiliate transactions or performance;

2. Whether BellSouth seeks to avoid its ILEC obligations through BSE's ability to select BellSouth's best customers and offer special deals that BellSouth cannot offer due to statutory prohibitions;

3. Whether there exists the potential for the prohibited acts of price squeezing and cross-subsidization;

4. Whether in the solicitation of BellSouth business customers by BSE, those customers will continue to be offered the same services under the same utility's name, with the same personnel over the same local network as employed by BellSouth;

---

[2]Tenn. Code Ann. § 65-5-207 authorizes the TRA to establish policies, rules, and orders requiring all telecommunications service providers to contribute to the support of universal service, which consists of residential basic local exchange telephone service at affordable rates and carrier-of-last-resort obligations.

5.      Whether BSE presented substantial and material evidence that it would provide services to consumers that could not be offered by BellSouth; and

6.      Whether it is in the public interest for a Regional Bell Operating Company ("RBOC") such as BellSouth, to have an affiliated CLEC operating within its territory.

The last issue involves BellSouth's status as a RBOC, and that issue again requires some background explanation. In 1974, the U.S. Department of Justice brought an antitrust action against AT&T for monopolization of telecommunications services and equipment. *United States v. American Tel. and Tel. Co.*, 552 F. Supp. 131 (D.D.C. 1982), *aff'd sub nom. Maryland v. United States*, 406 U.S. 1001, 103 S. Ct. 1240 (1983). That long and complex litigation resulted in a settlement reflected in a consent decree. This consent decree required AT&T to divest itself of the twenty or so Bell operating companies ("BOCs") that provided local telephone service as monopolies. Under the court-approved plan, these BOCs were spun off from AT&T and grouped into seven regional holding companies, or RBOCs, who continued to provide local service as regulated monopolies until the 1996 Telecommunications Act and/or similar legislation in various states. *See AT&T Corp. v. Federal Communications Comm'n*, 220 F.3d 607, 611 (D.C. Cir. 2000). Bell South is a RBOC. *Id.*; *see also* 47 U.S.C. § 153(4) (defining "Bell operating company" by listing twenty companies by name, including South Central Bell Telephone Company, the predecessor of BST). Although the Bell operating companies were allowed to retain their state-regulated monopolies on local service, they were prohibited by the consent decree from entering other parts of the telecommunications business, including long distance, equipment sales, and specified other services. *United States v. American Tel. and Tel. Co.*, 552 F. Supp. at 224.

The Telecommunications Act of 1996 rescinded the consent decree. While a number of key provisions apply to all incumbent local exchange carriers, such as the requirement that they offer nondiscriminatory access and interconnection to local competitors, 47 U.S.C. § 251, the Act also includes "Special Provisions Concerning Bell Operating Companies," 47 U.S.C. §§ 271 to -276, which apply only to the BOCs and their affiliates. Some of these provisions allow BOCs to enter into formerly prohibited areas of the telecommunications market, but only under specifically enumerated conditions. Of primary importance, § 271 establishes requirements that a BOC or its affiliate must meet before it can provide long distance, or InterLATA, services. Those requirements relate primarily to interconnection and include a competitive checklist insuring, among other things, nondiscriminatory access to network elements and other facilities and services. 47 U.S.C. § 271(c).[3]

BOCs and their affiliates are barred from manufacturing and selling equipment until they have received authorization to provide interLATA services, which, of course, requires demonstrated

---

[3]The Act further provides that the FCC cannot approve a BOC or BOC affiliate application to provide interLATA services unless it finds that the applicant has met the requirements with respect to access and interconnection, has fully implemented the competitive checklist, "the requested authorization will be carried out in accordance with the requirements of section 272," and the approval is consistent with the public interest, convenience and necessity. 47 U.S.C. § 271(d)(3).

compliance with the nondiscriminatory access requirements and the competitive checklist. 47 U.S.C. § 273. That section includes additional strictures on such manufacturing activities. Section 276 includes nondiscrimination safeguards for provision of payphone services by a BOC and a requirement that a BOC may not subsidize its payphone services directly or indirectly from its telephone exchange service operations. In addition, BOCs may provide electronic publishing only through a separate affiliate or through a joint venture operated according to specific requirements, including structural separation. 47 U.S.C. § 274.[4]

Most relevant to our analysis of the issues herein, because of the parties' references to and arguments about "Section 272 affiliates" is the requirement of 47 U.S.C. § 272, which the FCC has described as follows:

> Section 272(a) provides that a BOC (including any affiliate) that is a LEC subject to the requirements of section 251(c) may provide certain services only through a separate affiliate. Under section 272, BOCs (or BOC affiliates) may engage in the following activities only through one or more affiliates that are separate from the incumbent LEC entity: (A) manufacturing activities; (B) interLATA telecommunications services that originate in-region; and (C) interLATA information services.

*In the Matter of Implementation of the Non-Accounting Safeguards of Sections 271 and 272 of the Communications Act of 1934, As Amended,* CC Docket No. 96-149, First Report and Order, at ¶ 50 (rel. Dec. 24, 1996) (footnotes omitted).

The statute establishes "structural and transactional requirements" for § 272 separate affiliates, including independent operation, maintenance of separate books and records, totally separate officers, directors and employees, and no credit arrangement whereby recourse may be had against the assets of the BOC. 47 U.S.C. § 272(b)(1) - (4). In addition, the affiliate is required "to conduct all transactions with the Bell operating company of which it is an affiliate on an arm's length basis with any such transactions reduced to writing and available for public inspection." 47 U.S.C. § 272(b)(5). Nondiscrimination safeguards also exist. 47 U.S.C. § 272(c).

It is this structural and operational separation between the BOC and its affiliate which has been determined on the federal level to provide protection against anticompetitive practices. It allows a BOC affiliate to provide some services that the BOC itself would be prohibited from providing. This separation is a critical element in understanding the TRA's position herein.

---

[4] This required structural separation, or line-of-business restriction, has been upheld in a bill of attainder and first amendment challenge. *BellSouth Corp. v. F.C.C.*, 144 F.3d 58, 61 (D.C. Cir. 1998), *cert. denied*, Apr. 26, 1999.

## II. ILEC Affiliation

The TRA has previously granted certificates to over thirty competing local exchange carriers to provide local services on a statewide basis. In addition, the TRA has granted certificates as CLECs to two affiliates of ILECs, namely Citizens Telecommunications Company of Tennessee and United Telephones-Southeast, Inc.[5] BSE asserts that these prior approvals establish precedent which the TRA must follow and require that BSE's statewide application be granted because the TRA is required by federal and state law to certificate CLECs on a competitively neutral basis.

The TRA responds that its prior decisions, involving other companies in other situations, do not bind it in this situation. It also asserts, and found, that BellSouth and its affiliate BST or BellSouth are different from other CLECs and their affiliates and present unique issues. The TRA found:

> In Tennessee, Citizens, Sprint, and their affiliated companies are not similarly situated to BellSouth and BSE. Neither Citizens nor Sprint are RBOCs, and neither possesses the historical market dominance so closely associated with RBOCs such as BellSouth. Unlike Citizens and Sprint, BellSouth maintains approximately eighty percent (80%) of the access lines in Tennessee. Therefore, since BSE is the affiliate of the dominant local exchange carrier in Tennessee, the actions which BSE seeks to take must be evaluated by assessing whether such actions will truly foster competition in Tennessee. The authority finds that Citizens and Sprint are not similarly situated to BSE and BellSouth.

(footnotes omitted).

If the TRA had determined that BSE was ineligible to be certified statewide as a CLEC on the basis that an affiliate was disqualified from certification in the same market where its affiliate was the incumbent provider, the two prior approvals would pose serious problems to affirming the TRA's order herein. However, the TRA did not find that such a *per se* disqualification existed, and we can find none in the statute. The prior approvals indicate that the TRA interpreted the Telecommunications Act as authorizing affiliates of ILECs to be certified as CLECs statewide, including in those markets where the affiliate was the incumbent.

---

[5] At BSE's request, at the hearing involved herein the TRA took judicial notice of its grant of these certificates, and the records from those proceedings have been included in the record herein. Those records reflect that the TRA granted to Sprint Communications Company, L.P. a certificate to provide intrastate service based upon an application to provide a full array of telecommunications services normally provided by an incumbent local exchange telephone company throughout the State of Tennessee in all geographic locations permitted under Tenn. Code Ann. § 65-4-201. Similarly, Citizens Telecommunications Company filed an application for certification as a CLEC seeking authority to operate statewide to provide a full array of telecommunications services as would normally be provided by an incumbent local exchange telephone company. The TRA granted the application.

The prior approvals also serve to rebut an argument made herein by the intervenors. Those intervenors argue that it is illegal under Tennessee law for BellSouth to operate as both an ILEC and a CLEC in the same service territory. They assert that because the Telecommunications Act defines a CLEC as a carrier providing service before June 6, 1995, and defines an ILEC as a provider of services certified after June 6, 1995, an ILEC cannot be a CLEC. We do not disagree that the statute envisions an ILEC and a CLEC as being different entities.

However, the intervenors argue that because BST cannot be a CLEC, BellSouth should not be allowed to accomplish the same illegal result through use of an affiliate; i.e., BST cannot do indirectly what it is prohibited from doing directly. While much of the intervenors' argument is addressed to BellSouth's market dominance and position, their argument is also based upon the statutory distinctions between ILECs and CLECs. To that extent, the intervenors' assertions that BellSouth cannot operate both an ILEC and a CLEC would apply equally to any other affiliate relationship. Obviously, the TRA has rejected that interpretation of the statute by certifying as CLECs at least two other entities affiliated with ILECs. We find no basis for rejecting the TRA's interpretation. In fact, the legislature apparently foresaw the possibility of an ILEC providing services to an "affiliated entity." *See* Tenn. Code Ann. § 65-5-208(c).

As the TRA's order makes clear, its denial of BSE's request for a certificate for statewide CLEC status was not based upon BSE's status as an affiliate of an ILEC *per se*. Instead, it was related to the unique position enjoyed by BellSouth as the dominant provider of local exchange services and as a Bell operating company.

We agree with the TRA that each application must be considered on its own merits and upon the facts of each individual situation. In the instant situation, the facts raise issues as to the effect of certification on competition which may differ from those raised by other incumbent affiliate applications. However, the TRA cannot apply legal requirements arbitrarily or capriciously and must have a factual basis for its actions. Tenn. Code Ann. § 4-5-322(h).

### III. BOC Status

As set out earlier, BellSouth, BST and BSE (as an affiliate of a BOC) are subject to specific provisions of the Telecommunications Act of 1996 not applicable to other CLECs. The question is whether that status justifies a differing approach or standard for BSE's qualification as a CLEC than that applied to affiliates of other ILECs who are not also BOCs.

BSE argues that the FCC has recognized or authorized affiliates of ILECs and BOCs. The TRA has acknowledged and referred to the FCC's rulings on specific arrangements, but has distinguished the situation covered by those rulings from the situation presented by BSE's application herein.

The FCC has considered the question of the provision of local exchange and exchange access by Section 272 BOC affiliates and reached the following conclusion:

Based on our analysis of the record and the applicable statutory provisions, we conclude that section 272 does not prohibit a section 272 affiliate from providing local exchange services **in addition to** interLATA services, nor can such a prohibition be read into this section. Specifically, section 272(a)(1) states that - -

> A Bell operating company (including any affiliate) which is a local exchange carrier that is subject to the requirements of section 251(c) may not provide any service described in [section 272(a)(2)] unless it provides that service through one or more affiliates that . . . are separate from any operating company entity that is subject to the requirements from section 251(c) . . .

> We find that the statutory language is clear on its face - - a BOC section 272 affiliate is not precluded under section 272 from providing local exchange service, **provided that the affiliate does not qualify as an incumbent LEC subject to the requirements of section 251(c)**.

*In the Matter of Implementation of the Non-Accounting Safeguards of Sections 271 and 272 of the Communications Act of 1934, As Amended,* CC Docket No. 96-149, First Report and Order, at ¶ 312 (rel. Dec. 24, 1996) (emphasis added).

It is clear that the FCC's comments are addressed to those BOC affiliates which are Section 272 affiliates and are operated independently from an ILEC affiliate. They apply where the BOC incumbent has been authorized to provide long distance services. This means that the BOC incumbent has demonstrated to the FCC's satisfaction that it has complied with the various competition requirements set out in 47 U.S.C. § 271.

We agree with the TRA that the FCC rulings relied upon by BSE do not directly apply to an application by an affiliate of a BOC which is not a Section 272 affiliate to provide local service in an area where the BOC is the incumbent. While BSE is not incorrect in asserting that these FCC rulings do not prohibit the grant of its application, they also do not require it. The FCC, based on federal statutory law, has found that BOC affiliates may provide certain kinds of services when circumstances not present in the case before us exist.

BSE is not a Section 272 affiliate, and does not claim to be. Section 272 affiliate status only applies to affiliates of a BOC which have received Section 271 approval. The TRA determined that BSE "remains a type of affiliate not contemplated under § 272." In addition, the TRA explained:

It is appropriate that BSE has not requested in its Application to provide non-incidental services, because BSE cannot satisfy the requirements for a Section 272 affiliate, for those services, until interLATA permission is granted pursuant to Section 271. The Authority concludes that BSE cannot, at this time, as a matter of law, provide Section 272(a)(2) non-incidental services, does not intend to provide

-10-

Section 272(a)(2) incidental services, and is, therefore, not a Section 272 affiliate. Having concluded as such it is difficult to embrace the position that the safeguards established under Section 272 are applicable to BSE. It is equally difficult to accept that an entity such as BSE is of the type contemplated by the FCC's pronouncement that Section 272 does not prohibit a Section 272 affiliate from providing local exchange services in addition to interLATA services.

(footnotes omitted).

The TRA asserts that BSE's lack of Section 272 status is important is considering the competitive goals of both federal and state legislation. The Authority contends that Section 271 approval indicates satisfaction of the requirements for entry into the long distance market, including compliance with the competitive checklist. As of the date of the proceedings herein, BellSouth did not have Section 271 approval, and the TRA states that BellSouth has been denied that approval several times by the FCC and in other states.[6] Consequently, the TRA found that BSE had not been required to show that it has adequate operations support systems with performance measurements in place which would "provide assurance that the public welfare is protected by ensuring that competing carriers have a means to compete and are treated in a competitively neutral manner by the ILEC [BST]." The TRA also found that not only does the denial of such approval indicate that the required proof of compliance with competitive safeguards was not provided in those proceedings, the TRA found that BSE did not demonstrate such compliance in the hearing herein.

The TRA did not deny the application for statewide CLEC certification because of BSE's status as a BOC or BOC affiliate. It did, however, consider that status as a factor in its consideration of the competitive effect of allowing BSE to compete with its affiliate where the competition protections assured by Section 272 affiliate status are not present. We conclude that neither BSE's status as an ILEC affiliate nor its status as a BOC affiliate was the basis for the TRA's denial. That

---

[6]For example:

*In the Matter of Application of BellSouth Corporation, et al., Pursuant to Section 271 of the Communications Act of 1934, as amended, to Provide In-Region, InterLATA Services in South Carolina,* 13 FCC Rcd 539, 547 P 14 (1997) (failure to (1) provide nondiscriminatory access to operations support systems, (2) provide unbundled network elements in a manner that permits competing carriers to combine them through collocation, and (3) offer certain retail services at discounted rates), *aff'd, BellSouth Corp. v. FCC,* 333 U.S. App. D.C. 253, 162 F.3d 678 (D.C. Cir. 1998); *In the Matter of Application by BellSouth Corporation, et al., Pursuant to Section 271 of the Communications Act of 1934, as amended, to Provide In-Region, InterLATA Services in Louisiana,* 13 FCC Rcd 6245, 6246-47 P 1 (1998) (failure to provide nondiscriminatory access to operations support system and to make telecommunications services available for resale); *In the Matter of Application of BellSouth Corporation, BellSouth Telecommunications, Inc., and BellSouth Long Distance, Inc., for Provision of In-Region, InterLATA Services in Louisiana,* 13 FCC Rcd 20599, 20605 P 10 (1998) (failure to provide nondiscriminatory access to operations support system and unbundled network elements).

*AT&T Corp. v. FCC,* 220 F.3d at 613.

-11-

status did, however, influence the standards applied by the TRA to BSE in its consideration of the competitive effect of granting BSE's application.

## IV. The Issues Presented and The Standard of Review

As the list of TRA concerns set out earlier in this opinion demonstrates, the TRA focused its decision on the potential for anticompetitive activities and conduct if an affiliate of the Regional Bell Operating Company and ILEC were certified as a CLEC, especially in the absence of the protections provided by federal law to Section 272 affiliates. In the order now under appeal, the TRA noted that in its previous denial "one critical area of concern was that the affiliate relationship between BST and BSE could be potentially and irreversibly adverse to competition." The TRA found without Section 271 approval of BellSouth, there was still no evidence that BellSouth had the necessary safeguards in place to ensure fair treatment among all CLECs and further stated:

> Exacerbating our concern is that no other performance measurements have been established, which arguably help to serve as support to the existence of competitive neutrality in the relationship between BellSouth, BSE and other CLECs. Without these safeguards and measurements the Authority would have difficulty determining whether BellSouth in fact afforded preferential treatment to its affiliate CLEC in Tennessee.

It was on the basis of these concerns that the TRA determined that approval of BSE's application was not in the public interest and "may, in fact" be inconsistent with the goal of competition. The TRA concluded that BSE offered little convincing evidence or testimony to diminish its concerns regarding potentially abusive collusive behavior.

On appeal, our review of the TRA's order is governed by Tenn. Code Ann. § 4-5-322(h), which provides:

> The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if the rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions or decisions are:
>
> (1) In violation of constitutional or statutory provisions;
> (2) In excess of the statutory authority of the agency;
> (3) Made upon unlawful procedure;
> (4) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
> (5) Unsupported by evidence which is both substantial and material in the light of the entire record.

In determining the substantiality of evidence, the court shall take into account whatever in the record fairly detracts from its weight, but the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact.

The TRA may exercise only that authority given it expressly by statute or arising by necessary implication from an express grant. *BellSouth Adver. & Publ'g Corp. v. Tennessee Regulatory Auth.*, 79 S.W.3d 506, 512 (Tenn. 2002); *Tennessee Pub. Serv. Comm'n v. Southern Ry. Co.*, 554 S.W.2d 612, 613 (Tenn. 1977). The General Assembly has given the TRA "practically plenary authority over the utilities within its jurisdiction." *BellSouth Adver. & Publ'g Corp.*, 79 S.W.3d at 312 (quoting *Tennessee Cable Television Ass'n v. Tennessee Pub. Serv. Comm'n*, 844 S.W.2d 151, 159 (Tenn. Ct. App. 1992)). The TRA has "general supervisory and regulatory power, jurisdiction, and control over all public utilities." Tenn. Code Ann. § 65-4-104. The General Assembly has given the TRA, in addition to other jurisdiction conferred, the authority to "investigate, hear and enter appropriate orders to resolve all contested issues of fact or law arising as a result of the application of Acts 1995, ch. 408 [the Tennessee Telecommunications Act]." Tenn. Code Ann. § 65-5-210(a).

BSE asserts, however, that the TRA's order was contrary to governing statutory provisions. In reviewing BSE's request, the TRA was required to apply Tenn. Code Ann. § 65-4-201(c), quoted earlier, which establishes the requirements for certification as a competing provider. BSE asserts that it met the two requirements by demonstrating: (1) that it will adhere to all applicable TRA policies, rules and orders; and (2) that it possesses managerial, financial and technical abilities to provide the services. BSE cites the TRA's approval of it as a CLEC in some territories in Tennessee as proof the TRA has found that BSE meets these statutory qualifications. Accordingly, BSE argues, the TRA was required to grant its application for statewide certification because of the mandatory language of the statute.

There is no dispute that BSE met the two requirements of Tenn. Code Ann. § 65-4-201(c). The TRA, however, determined that its other statutorily assigned responsibilities required it to examine the application in light of its effect on competition, including its responsibility under Tenn. Code Ann. § 65-4-201(a) to consider the present and future public interest in determining whether to grant a certificate of convenience and necessity. In the case herein, however, the TRA defined that public interest in terms of the impact of BSE's application on competition. It is clear from the order that the TRA's reason for denying BSE certification as a CLEC in those areas where its affiliate was the ILEC was its determination that such certification could adversely impact the development of competition in the provision of local telephone service.

The TRA maintains that it was required to consider the effect on competition. The TRA relied upon its obligations set out in Tenn. Code Ann. § 65-5-208(c), also quoted above, to prohibit anticompetitive practices in dealings between the incumbent and competitors. The TRA was also mindful of the General Assembly's policy of fostering competition, as set out in the Tennessee Telecommunications Act of 1995:

-13-

The general assembly declares that the policy of this state is to foster the development of an efficient, technologically advanced, statewide system of telecommunications services by permitting competition in all telecommunications services markets, and by permitting alternative forms of regulation for telecommunications services and telecommunications services providers. To that end, the regulation of telecommunications services and telecommunications services providers shall protect the interests of consumers without unreasonable prejudice or disadvantage to any telecommunications services provider; universal service shall be maintained; and rates charged to residential customers for essential telecommunications services shall remain affordable.

Tenn. Code Ann. § 65-4-123. In the preamble to the Tennessee Telecommunications Act, the General Assembly stated a policy that "Competition among providers should be made fair by requiring that all regulation be applied impartially and without discrimination to each." 1995 Tenn. Pub. Acts ch. 408.

In addition, federal law places a duty on the TRA to promote or insure competition in the provision of telecommunication services. In particular, the Telecommunications Act of 1996 requires removal of barriers to entry into that business and states:

(a) In general. No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.

(b) State regulatory authority. Nothing in this section shall affect the ability of a State to impose, on a competitively neutral basis and consistent with Section 254 of this title, requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers.

47 U.S.C. § 253.

We agree with the TRA that it has the authority to consider the effect on competition of an application for statewide certification as a CLEC. In addition to its general almost plenary authority to regulate public utilities and the authority granted by the statutes quoted herein, it also has specific authority to adopt rules or issue orders to prohibit anticompetitive practices. Tenn. Code Ann. § 65-5-208(c). Thus, we conclude the TRA did not act in excess or in contravention of relevant statutory authority in considering the effect on competition.

However, the authority to consider the effect on competition does not remove the requirements that the agency base its decisions on substantial and material evidence and that those decisions not be arbitrary or capricious. The determinative issues in this appeal are framed by BSE's arguments that the TRA's decision was arbitrary because it differentiated among ILEC affiliates and

-14-

that the decision was based upon speculation and not upon the evidence and, therefore, is not supported by substantial and material evidence. In addition, BSE asserts that the TRA's order is actually anticompetitive and prevents BSE's entry into the market as a competing local exchange service provider by establishing more stringent requirements for it than those applied to other ILEC affiliates. The intervenors assert that BST is already dominant in the local services market, making removal of barriers to entry irrelevant. The TRA asserts its order was designed to further the competition envisioned by both federal and state law.

The TRA did, in fact, treat BSE's application differently from applications for statewide CLEC certification other affiliates of ILECs. They based this differing treatment on BSE's relationship to BellSouth, which has undisputed market dominance in the state and which is a BOC. Regional Bell Operating Companies have been subject to strictures and limitations not applicable to other companies since the consent order was entered in *United States v. American Tel. and Tel. Co.* The 1996 Telecommunications Act has special provisions relating to RBOCs. Because RBOCs had gained control of the local services markets through a monopoly, such measures were considered necessary if true competition were to develop as a practical matter.

The FCC has recognized the authority of state regulatory agencies to treat certain BOC related entities differently because of the potential impact on competition.

> State regulation. As mentioned above, several BOCs have already submitted applications to state regulatory commissions seeking authority to provide both local exchange services and interLATA services from the same affiliate. Although we conclude that the 1996 Act permits section 272 affiliates to offer local exchange service in addition to interLATA service, we recognize that individual states may regulate such integrated affiliates differently than other carriers.[7]

*In the Matter of Implementation of the Non-Accounting Safeguards of Sections 271 and 272 of the Communications Act of 1934, As Amended,* CC Docket No. 96-149, First Report and Order, at ¶ 317 (rel. Dec. 24, 1996) (footnotes omitted).

Although state statues do not make reference to RBOCs, we conclude that the TRA had the authority to consider BellSouth's market dominance in the state and its status as a BOC in analyzing the competitive effects of its affiliate's application. We also conclude that Tenn. Code Ann. § 65-5-208(c) gave the TRA the authority to issue orders which would prohibit the specific anticompetitive

---

[7]BSE's application does not include a proposal to provide interLATA (long distance) services. As discussed earlier, the FCC's pronouncements have involved Section 272 affiliates who propose to provide both local and long distance services. Thus, in our earlier discussion of BOC status, we have agreed with the TRA that the FCC's recognition of BOC and ILEC affiliates is not dispositive of the question of whether an affiliate which is not a Section 272 affiliate may qualify as a CLEC where its affiliate is the ILEC. However, while the finding that state regulatory agencies may regulate integrated affiliates differently from other entities is not directly applicable to a non-272 affiliate becoming a CLEC, we think the principles involved are similar enough to warrant reliance on the FCC's recognition of state agencies' authority to regulate BOC affiliates differently.

practices listed in the statute, as well as others. Because the relationship between BST, BSE, and BellSouth provides a situation where such practices can develop, the TRA was authorized to examine this situation differently from other applications and to adopt rules or to establish by order standards or requirements to fulfill its responsibility to further competition.

However, that is not what the TRA did. Instead of "regulating" a BOC affiliate differently, the TRA denied the certification. BSE describes the TRA's decision as "Rather than engage with BSE in a reasonable framework of regulation for its services in the market, the TRA has chosen to simply deny BSE a place at the table." The question is whether the TRA could deny certification under the facts presented.

V.

The TRA had previously expressed its concerns about the potential for anticompetitive conduct between BSE and its affiliates. The second hearing was held to allow BSE to address those concerns. In the hearing, BSE offered to submit itself to various requirements to alleviate the concerns of the TRA. In specific, BSE offered:

(1)     To operate independently from BST;
(2)     To maintain its books, records, and accounts separate from the books, records, and accounts maintained by BST;
(3)     To have separate officers, directors, and employees from BST;
(4)     Not to obtain credit under any arrangement that would permit a creditor, upon default, to have recourse to the assets of BST;
(5)     To conduct all transactions with BST on an arms' length basis with any such transactions reduced to writing and available for public inspection;[8]
(6)     Not to engage in cross-subsidization, granting preferences to competitive services or affiliated entities, predatory pricing, price squeezing, price discrimination, tying arrangements, or other anticompetitive practices as prohibited by Tenn. Code Ann. § 65-5-208(c);
(7)     To set its price floor equal to the wholesale price it pays to BST;
(8)     To file and resell its Contract Service Agreements;
(9)     To be bound by the non-discrimination requirements of 47 U.S.C. §§ 251 and 252;
(10)   To file tariffs;
(11)   To consent to regular audits of its operations by the TRA;
(12)   To provide cost allocation data of its operations;
(13)   To accept advertising restrictions assuring that any advertising would properly identify "BellSouth BSE";
(14)   To submit to any other applicable ILEC Rules in the event BSE undertakes the activities of its ILEC affiliate BST; and
(15)   To abide by any and all of the applicable TRA policies, rules and orders.

---

[8] Items 1-5 replicate the structural separation requirements set out in 47 U.S.C. § 272(b).

The TRA found these promises insufficient, primarily for three reasons. It determined that BSE's failure to file a cost allocation manual prevented the Authority from determining whether appropriate safeguards were in place to prevent cross-subsidies between regulated and non-regulated services.[9] Similarly, BSE did not file a business plan, and the TRA stated it routinely examined such plans when considering CLEC applications. The TRA found that "The lack of a business plan and cost allocation manual prevents the Authority from determining the extent to which BSE intends to operate, and whether such operation and the provisioning of telecommunications services on an expanded level is compatible with the public interest."

Although BSE did not file a business plan, an Intervenor introduced into evidence a report prepared for BellSouth by a consultant regarding the benefits to BellSouth of sending a CLEC affiliate into various markets. BSE disavowed the report, stating that it did not serve as BSE's business plan. In its brief, the TRA argues the report is "significant, not as a representation of BSE's current or future business practices, but for its indication of the most obvious opportunities that a CLEC affiliate would provide for BellSouth and for the fact that BellSouth was studying these opportunities in great detail." The brief continues:

> The report is replete with statements that BellSouth viewed its "CLEC" as an extension of BellSouth, which would benefit from maximum identification with BellSouth, that the CLEC would be operated as part of a comprehensive business strategy that would pertain to all BellSouth companies, and that the CLEC would offer many ways of circumventing regulatory restraints on BellSouth's incumbent LEC operations. . . . Elsewhere, the report states that the rationale for establishing a CLEC is that "BellSouth needs alternatives to gain pricing and packaging freedoms."

We do not disagree with the TRA's description of the report. Although BSE denied the report was ever its business plan, the TRA argues that "The existence of this report submitted by the Intervenors and the absence of a business plan from BSE creates a reasonable presumption that BST intended to let loose its affiliate 'CLEC' upon the market not as a truly independent competitor and in order to circumvent regulatory requirements."

The final, and apparently most significant, reason given by the TRA is its interpretation of BSE's offer to be bound by a price floor equal to the resale price it pays to BST for the purchase of its telecommunications services. As discussed above, Tenn. Code Ann. § 65-5-208(c) requires an ILEC to adhere to a price floor for its competitive services which must equal the ILEC's rates for essential services used by CLECs plus the total long-run incremental cost of the competitive elements of the service.

---

[9] There is proof in the record that with regard to BSE's operation in the Tampa, Florida area, cost allocations between BSE and BellSouth's cellular phone company were not very strict, even though the companies shared some costs. For example, the cellular provider paid all advertising costs, and BSE did not pay a portion of that.

One of the major concerns of the intervenors was the price floor issue. On appeal, they argue that Tennessee has established a "price floor" for certain ILEC services and prohibited the ILEC from charging customers less than that amount for the purpose of preventing ILECs from engaging in predatory pricing, *i.e.*, pricing services below cost. The intervenors' expert testified that the price floor statute prevents an incumbent provider with market power from pricing services at less than cost and thereby discouraging potential competitors from building their own networks. Essentially, the intervenors argue that since an ILEC is restricted by law to a price floor, the same public policy requires that an affiliate of an ILEC be subject to the same restriction because the ILEC should not be allowed to avoid the statutory price floor by operating through an affiliate.[10]

The TRA was also unconvinced that BSE's offer regarding the price floor was sufficient to alleviate its concerns about anticompetitive conduct and found:

> In an effort to lessen the anti-competitive effect of its expanded certification, BSE agreed to be bound by a price floor equal to the resale price paid to BellSouth for the purchase of its telecommunications services. However, BSE failed to demonstrate whether the resale price it will pay to BellSouth will or will not include operator service costs, administrative costs, or marketing and advertising costs. Absent an evidentiary demonstration of all costs to be included in the resale price paid to BST, the "price floor" promised by BSE may not be comparable to that set for incumbents under Tenn. Code Ann. § 65-5-208(c). Furthermore, the Authority is of the opinion that if a price floor is to act as a deterrent against price squeezing, the floor must be set in a manner that will ensure that all of the costs of providing the services are included therein. Thus, a meaningful promise to be bound to a price floor will not only include the rate paid to BellSouth by BSE, but will also include additional costs incurred by BSE in providing such services. Under BSE's proposal to set the price floor at the resale rate paid to BellSouth, BSE would still be free to sell a service below the total cost that BSE must incur to provide that service.

---

[10] The intervenors' position is explained in their brief as follows:

Based on the testimony at the second hearing, here is how BSE's scheme would work: Under federal law, BellSouth is required to make all services available for resale at a discounted, wholesale rate. In Tennessee, state regulators have determined that BellSouth's wholesale rate should be 16% less than the carrier's retail rate. Thus, if BellSouth's retail rate for local service were $12.15, a CLEC may purchase that service for a discounted price of $10.31.

During cross-examination, [BSE] was asked to assume, for the sake of argument, that BellSouth's $12.15 rate was also the price floor for that service, as calculated in accordance with section 208(c). Under those circumstances he repeatedly maintained that BSE could legally purchase BellSouth's service at the wholesale rate and resell it for $10.31 or $10.81, substantially less than BellSouth's price floor. In an effort to persuade the TRA to approve BSE's proposal, [BSE] said BSE would agree to price its services at no less than $10.31 - the wholesale price it paid to BellSouth - but would not agree to abide by BellSouth's price floor of $12.15.

On appeal, the TRA contends that the danger of a price squeeze is presented by the possibility that BSE would lower its resale price, "as long as the cost components of that price are undisclosed or are subject to manipulation," to a level that competitors of BSE and BST would be unable to match. The TRA found BSE's promise to set its price floor at the resale rate it pays BST would still allow BSE to resell a service below the overall cost to BSE of providing the service. The TRA contends this situation results in an "obvious opportunity" for a price squeeze. *See Town of Norwood v. New England Power Co.*, 202 F.3d 408, 418 (1st Cir. 2000) (explaining the "traditional price squeeze").

The TRA points out that BSE has never agreed to apply the price floor as described by the TRA. BSE argues that its price floor agreement must be considered in conjunction with the other safeguards it promised to comply with, which will "ensure that all of the costs of providing its services are included in its pricing."

The price floor statute only applies to incumbent providers and does not by its terms apply to CLECs. In fact, in situations where an affiliate relationship with the incumbent is not present, the issue would simply not arise. Consequently, the TRA must rely upon its authority to promote competition and prevent anticompetitive practices as authority for its decision. There is no evidence in the record that in the other situations where the TRA has approved an affiliate of the incumbent provider as a CLEC that any such price floor requirement has been imposed.

It is the relationship between BSE and BellSouth and BellSouth's market dominance and status as a RBOC that created the "concerns" that led the TRA to determine that anticompetitive practices might occur. It is actually the potential for BellSouth to use a subsidiary to circumvent restrictions placed on its operation by federal and state law and regulation, to the detriment of competition, which is at the core of the TRA's action. The fact that it is the affiliate relationship that is the problem is exemplified in the TRA's finding that, "Counterbalancing these proposals [BSE's agreement to the listed restrictions] in the record before the TRA are BSE's numerous demonstrations of its close ties to BST. Further, as BSE's witness admitted, BSE and BST will remain affiliates. BSE will be nominally independent of BST, but neither will be truly independent of BellSouth Corporation."[11] Although the TRA did not decide that no affiliate of BellSouth or BST could be certified as a CLEC in those areas where BST is the incumbent provider, it did not by rule or order establish minimum requirements to insure the type of independent operation it felt necessary to prevent "possibilities" for anticompetitive conduct.

---

[11]The Intervenors assert that this case is simply about whether BellSouth can be both an ILEC and a CLEC at the same time and in the same service territory. "Since BSE does not propose to offer any services to Tennessee customers that BellSouth itself cannot also offer, the only apparent reason for BSE's creation is to allow BellSouth to do indirectly, through an affiliate, what it cannot do directly, i.e., to engage in otherwise prohibited pricing and marketing strategies." The intervenors assert that the BellSouth companies are attempting to avoid the effect of those statutes which prohibit BellSouth itself from obtaining a CLEC certificate and which regulate BellSouth as the incumbent provider. This argument presupposes, among other things, that there is no structural and operational separation between the affiliates.

The FCC has addressed concerns similar to those raised by the TRA in the context of a Section 272 affiliate (an affiliate of a BOC which meets the structural separation requirements of 47 U.S.C. § 272) in its report entitled *In the Matter of Implementation of the Non-Accounting Safeguards of Sections 271 and 272 of the Communications Act of 1934, As Amended*, CC Docket No. 96-149, First Report and Order (rel. Dec. 24, 1996), wherein it made the following findings:

> We also conclude as a matter of policy that regulations prohibiting BOC section 272 affiliates from offering local exchange service do not serve the public interest. The goal of the 1996 Act is to encourage competition and innovation in the telecommunications market. We agree with the BOCs that the increased flexibility resulting from the ability to provide both interLATA and local services from the same entity serves the public interest, because such flexibility will encourage section 272 affiliates to provide innovative new services. To the extent that there are concerns that the BOCs will unlawfully subsidize their affiliates or accord them preferential treatment, we reiterate that improper cost allocation and discrimination are prohibited by existing Commission rules and sections 251, 252, and 272 of the 1996 Act, and that predatory pricing is prohibited by the antitrust laws. Our affiliate transaction rules, as modified by our companion Accounting Safeguards Order, address the BOCs' ability to engage in improper cost allocation. The rules in this Order and our rules, in our First Interconnection Order and our Second Interconnection Order ensure that BOCs may not favor their affiliates. In sum, we find no basis in the record for concluding that competition in the local market would be harmed if a section 272 affiliate offers local exchange service to the public that is similar to local exchange service offered by the BOC.

*Id*. at ¶ 315 (footnotes omitted).

Of course, BSE is not a Section 272 affiliate, and the structural separation requirements established in that provision are not automatically imposed upon BSE. There is no impediment, however, to the TRA imposing the same safeguards as a condition to certification, by virtue of its authority under Tenn. Code Ann. § 65-5-208(c).[12] In fact, BSE and BellSouth agreed to be bound

---

[12]The Georgia Public Service Commission, in ruling on a similar application by BSE in Georgia, stated that:

> The critical issue that is raised in this proceeding stems from the affiliate relationship the Applicant has with the predominant incumbent local exchange carrier in Georgia, BellSouth Telecommunications, Inc. Testimony presented by the intervenors raises questions as to whether the service expected to be provided by the Applicant will indeed be in competition with BST. Or, will the entry of the Applicant into the local exchange market simply garner for the parent corporation an even larger share of the market in Georgia and thereby thwart the movement toward telecommunications competition in the state.

After finding that there was not sufficient cause to deny the application, the Commission found that certain conditions would be imposed. Those included use of the same operating system support as other CLECs, a prohibition of favoring

(continued...)

by those structural separation requirements. The TRA could have included other requirements directly related to preventing anticompetitive practices between BSE and BellSouth. Again, BSE and BellSouth agreed to additional safeguards, including the filing of various documents, accepting advertising restrictions which ensure the proper identification of the affiliate, providing cost allocation data, and setting its price floor equal to the wholesale price it pays to BST.

The TRA determined these offers were not sufficient. However, it did not, by order or rule, establish the minimum requirements or safeguards it thought necessary. Instead, it determined that BSE did not sufficiently allay concerns that anticompetitive practices might occur. The TRA found that approval of BSE's application "may" be inconsistent with the goal of fostering competition, that potentially abusive, collusive behavior "might" occur, and that the relationship "could be potentially" adverse to competition.

Additionally, the TRA is not bound by the FCC's judgment that competition in local markets would not be harmed, considering the safeguards provided elsewhere, if Section 272 affiliates were to offer local service. The TRA is authorized to make its own determination about the effect of competition in this state. However, the TRA did not make a determination that competition would be adversely affected by certification of BSE statewide. It merely found that certification "may" be contrary to promotion of competition. Apparently, any harm to competition would come only if the affiliated entities acted collusively, in an anticompetitive manner, and in violation of existing prohibitions.

While Tenn. Code Ann. § 65-5-208(c) authorizes the TRA to implement safeguards to prohibit anticompetitive conduct between an ILEC and its affiliated CLEC, we can find nothing in the statute to authorize the TRA to deny certification of a related entity simply because, by its nature, the affiliate relationship may provide the opportunity for anticompetitive practices. The legislature has prohibited anticompetitive conduct, not affiliation relationships. The TRA's responsibility in that situation is to put in place standards or requirements to prohibit and prevent the anticompetitive possibilities from becoming realities and/or to make violations easier to discover so that regulation is effective.

We conclude that the TRA's decision herein must be vacated because it is in excess of the statutory authority of the agency. We remand to the TRA for consideration of BSE's application in light of the principles set out in this opinion. Because the order which is the subject of this appeal

---

[12](...continued)
treatment to BSE by the incumbent, and certain reporting requirements.

does not establish standards, requirements, or conditions, for the certification, we do not rule upon the validity of any such requirement.[13]  Costs of this appeal are taxed to the Tennessee Regulatory Authority.

_____
PATRICIA J. COTTRELL, JUDGE

---

[13]For example, we decline to address the issue of whether the TRA may impose a miniumum charge or price floor on BSE which insures it recoups all its costs.